# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF WISCONSIN
    -----------------------------------------------------
 3
    AMERICAN DESIGN & BUILD, INC.,
 4
                  Plaintiff,
 5
                  vs.            Case No. 2:11-CV-00293
 6
    HOUSTON CASUALTY COMPANY,
 7
                  Defendant.
 8
    -----------------------------------------------------
 9

10            Deposition of JIM LEATZOW

11            Thursday, March 7, 2013

12
                     12:13 p.m.
13
                        at
14
            MICHAEL BEST & FRIEDRICH LLP
15             100 East Wisconsin Avenue
                     Suite 3300
16               Milwaukee, Wisconsin

17

18

19

20

21

22

23       Reported by Dawn M. Lahti, RPR/CRR

24

25
```



| | | |
|---|---|---|
| 1 | Q | Do you know who made the decision on what documents |
| 2 | | you were provided in this case? |
| 3 | A | No. |
| 4 | Q | Who had input on what was included in your report? |
| 5 | A | Me. |
| 6 | Q | Did anyone else have any input? |
| 7 | A | No. Since I was tasked with the responsibility of |
| 8 | | determining coverage, I requested any documents |
| 9 | | that had a bearing on coverage specifically. |
| 10 | Q | Did the Madden Law Firm tell you how many hours to |
| 11 | | spend on this case? |
| 12 | A | No. |
| 13 | Q | Did the Madden Law Firm tell you how many hours to |
| 14 | | spend on your report? |
| 15 | A | No. |
| 16 | Q | Is there any further work or investigation to be |
| 17 | | performed in this case? |
| 18 | A | Potentially for moving forward to trial, I assume |
| 19 | | there would be. |
| 20 | Q | But your report as it stands is complete? |
| 21 | A | That's correct. Although there is a disclaimer |
| 22 | | that should additional material be provided, that I |
| 23 | | have reserved my right to amend my report going |
| 24 | | forward, and that would apply as well for trial. |
| 25 | Q | And your rate in this case is $285 an hour? |

```
 1   Q   And what kind of lines did you -- were you an
 2       agent?
 3   A   I was an agent, I was a broker, I was a wholesaler,
 4       I was a managing general agent, and I was a claims
 5       handling third-party administrator TPA.
 6   Q   Let's break all those up then.  You were an agent.
 7       Who were you an agent for then, for individuals,
 8       for businesses?
 9   A   For insurance companies.
10   Q   So you were directly an insurance company's agent?
11   A   Yes.
12   Q   And you also said you were a broker?
13   A   Yes.
14   Q   Were you a broker for individuals or businesses?
15   A   Yes.
16   Q   And then you were also a wholesale broker?
17   A   A wholesaler is the term of art we use in the
18       industry.
19   Q   Okay.  And who were you a wholesaler for?
20   A   That would be where I had a role or an obligation
21       where I had access to a particular insurance
22       program and other brokers would come to my firm to
23       gain access to that insurance program.
24   Q   And what particular program did you have access to
25       in your role from 1975 to 2005?
```

1         opposed to a wholesaler?
2    A    There were over the years probably 30 companies.
3    Q    And what kind of insurance policies?
4    A    Anything and everything from personal lines through
5         heavy commercial lines, heavy property. My
6         specialty ultimately was errors and omissions.
7    Q    Do you do architecture design policies?
8    A    As E&O policies, yes, absolutely.
9    Q    And any other architect-type policies?
10   A    Well, the only other type would be general
11        liability and work comp. Yes, I did all of those.
12   Q    Now, I want to discuss your role as an MGA. First
13        of all, can you explain what an MGA is?
14   A    A managing general agent is someone who has
15        increased authority with an insurance company that
16        is delineated in a written contract. And that
17        authority can include any of the following aspects
18        of the insurance business.
19                 It might include the marketing of
20        product, the underwriting of the product, pricing,
21        physical issuance of the policy, the renewal
22        processing, the collecting of premium and the
23        handling of the renewals as well.
24   Q    And who did you serve as an MGA for from 1975 to
25        2005?

1  A   My first full blown MGA assignment was with Legion
2      beginning in 1993.
3  Q   And how did you obtain that role?
4  A   I developed an insurance program that was filling a
5      need in the marketplace, and it was an errors and
6      omissions program tailored after architects and
7      engineers-type coverage.
8  Q   For what select group?
9  A   For the four -- it started with landscape
10     architecture and ultimately morphed into the
11     irrigation designers, the consulting arborists and
12     urban planners on a national base.
13 Q   So for Legion and AIG subsequently, you were an MGA
14     solely for this E&O one form of policy?
15 A   Yes.
16 Q   And what were the limit maximums on that policy?
17 A   It varied over time, but ultimately it was $2
18     million.
19 Q   And did you have full underwriting authority in
20     your role as an MGA?
21 A   Yes.
22 Q   And that underwriting authority was spelled out in
23     the agreement between you and Legion and you and
24     AIG?
25 A   Yes.

| | | |
|---|---|---|
| 1 | Q | Okay.  So we talked about agent, broker, |
| 2 | | wholesaler, MGA.  Is there anything else that |
| 3 | | Leatzow & Associates did from 1975 to 2005? |
| 4 | A | Yes.  I was also a third-party administrator or TPA |
| 5 | | claims handler. |
| 6 | Q | And what did that involve? |
| 7 | A | Handling the claims of the same program that I |
| 8 | | authored and put in place. |
| 9 | Q | Can you describe to me what it means handling the |
| 10 | | claims? |
| 11 | A | Adjudicating every claim that came in.  If a |
| 12 | | policyholder had a claim, it would come to my firm, |
| 13 | | and I personally handled it.  I retained counsel in |
| 14 | | every claim -- locally in every claim I handled |
| 15 | | over the years.  I did that for over two decades. |
| 16 | Q | How many employees did you have at Leatzow & |
| 17 | | Associates? |
| 18 | A | 17. |
| 19 | Q | That's at its height? |
| 20 | A | Yes. |
| 21 | Q | When was that around? |
| 22 | A | Oh, that would have been around about 1990. |
| 23 | Q | And did any other individuals there have |
| 24 | | underwriting authority? |
| 25 | A | I gave staff underwriting authority within the |

1    firm.  I trained all of them because of the unique
2    nature of the products we were offering.
3  Q  So a number of people could have made underwriting
4    decisions at your company, not just you?
5  A  Yes.
6  Q  And that was per the contract you had with Legion
7    and AIG?
8  A  Yes.  The agency was given the authority, and I had
9    free rein within my organization to assign those
10   duties to whomever I chose.
11 Q  And in your experience, is MGA, that idea typical
12   for insurance companies?  Do a lot of insurance
13   companies have MGAs?
14 A  It has varied over time.  The insurance market
15   cycle in the past was very much like a very defined
16   wave, and it was a seven-year cycle.  And insurance
17   companies would go through that cycle, and it was
18   almost like a harmonic.  It was that pure.  But it
19   changed over time because of changes in interest
20   rates in the stock market and so forth.
21              And so the risk appetite of
22   insurance companies changes, and if they are in an
23   aggressive mode, they may find an MGA that has a
24   special expertise that they don't possess in-house.
25   And so they'll retain an MGA to do certain things,

|    |   |                                                                |
|----|---|----------------------------------------------------------------|
| 1  |   | experience if we can a little more. Do you                     |
| 2  |   | currently serve as an underwriter anymore?                     |
| 3  | A | Not anymore.                                                   |
| 4  | Q | And your underwriting experience was solely as an              |
| 5  |   | MGA, correct?                                                  |
| 6  | A | Yes. Well, that's not quite true. When you are an              |
| 7  |   | agent -- just so we're talking the same terms and              |
| 8  |   | there's clarity. An agent is one who has a                     |
| 9  |   | contract with an insurance company and is given                |
| 10 |   | certain levels of authority pursuant to their                  |
| 11 |   | agency agreement.                                              |
| 12 |   | A broker does not have the ability                             |
| 13 |   | to bind coverage and does not have a contract with             |
| 14 |   | the insurance company. In the industry the broker              |
| 15 |   | is thought to represent the needs of the insured.              |
| 16 |   | An agent can have a dual agency obligation to the              |
| 17 |   | insurer as well as to the insured.                             |
| 18 |   | The distinction between the two is                             |
| 19 |   | quite clear. An agent has a contract and has                   |
| 20 |   | binding authority or some other level of authority.            |
| 21 |   | A broker does not.                                             |
| 22 |   | In the case of an MGA, they have                               |
| 23 |   | binding authority generally, and that tends to be a            |
| 24 |   | larger or higher level of authority than an agent              |
| 25 |   | does.                                                          |

```
 1              So to come full circle to your
 2   question regarding underwriting.  As an agent when
 3   I was writing personal lines, homeowner's, auto,
 4   motorcycle policies, if I had binding authority, I
 5   would do the actual underwriting at some level of
 6   those risks if I had the authority to bind them.
 7 Q How many lines did you have binding authority on as
 8   an agent?
 9 A How many lines of insurance are there?  And I'm not
10   trying to be cute.  I'm just saying whether it be
11   auto, motorcycle, home, renters.
12 Q So the typical line you carried, you were in the
13   process of the underwriting decision?
14 A Where I was an agent?
15 Q When you were an agent.
16 A Yes.
17 Q Were you the final underwriter in that process or
18   someone else?
19 A If I had the binding authority, in certain
20   instances, yes, that would be an automatic issue
21   policy.  And in other instances, you had the
22   ability to bind, but the insurance company then may
23   choose to have oversight, review the application,
24   and if it met their needs, they would issue.  If it
25   didn't meet their needs, then they would go ahead
```

1 within the underwriting period, not allow the
2 policy to go forward.
3 Q So in any cases as an agent and in any of your
4 experience as an agent, did you have the final
5 authority without the insurer reviewing it?
6 A Yes.
7 Q Okay.
8 A And that was as an MGA.
9 Q But not as just an agent, as an MGA?
10 A Not that I recall. There may have been minor
11 policies, homeowner's policies, that sort of thing.
12 I believe in much of that I had the authority, and
13 the policies were an automatic issue.
14 Q So am I correct in saying that your underwriting
15 experience is limited to what you've described as
16 an agent underwriting experience and an MGA
17 underwriting experience?
18 A Yes. That could only be the whole world of
19 underwriting.
20 Q Well, you could have worked directly for an
21 insurance company as an underwriter?
22 A Correct, but I did not.
23 Q And that's simply what I was asking. You never
24 worked for an insurance company as an underwriter?
25 A Never.

| | | |
|---|---|---|
| 1 | Q | And in your career then as an agent, what would you ballpark the number of policies that you underwrote? |
| 4 | A | Thousands. |
| 5 | Q | And how about as an MGA? |
| 6 | A | Thousands. |
| 7 | Q | And have you ever underwritten a contractor's and consultant's professional liability policy? |
| 9 | A | Thousands. |
| 10 | Q | What's your experience related to the course of conduct of the underwriting process? |
| 12 | A | I don't understand the question. |
| 13 | Q | I guess what's your experience related to what occurs during the underwriting process? |
| 15 | A | You're evaluating the risk. And in order to do so, you have to have a certain degree of knowledge regarding the risk in order to ask appropriate questions.<br><br>In my case with my specialty program for which I was the MGA, I developed the applications. I knew more about the risk than anyone in the country, and so I knew the right questions to ask in order to properly underwrite and as a result of that formed a very profitable program that -- and that was the reason AIG wanted |

1  Q    Have you ever bound or underwritten a policy on
2       another insurance company's application?
3  A    Yes.
4  Q    Can you explain that instance?
5  A    It would have been seldom, but on occasion if a
6       risk came in and there was sufficient information
7       on that risk contained on a competing application
8       or some other company's application but there was
9       sufficient information to make the -- an informed
10      decision, then I do believe that occurred on a
11      limited basis.
12 Q    And would that have to be a more recent
13      application?  It wouldn't have been an application
14      that was signed weeks before?
15 A    The signing date wouldn't be particularly
16      important, and it was generic in the A&E or
17      architects and engineer's world where it was common
18      that you could make submissions.
19              I'm limiting the experience to what
20      I just described to you to my own program.  That
21      was exceptionally limited because I had unusual
22      questions that I had formulated as part of my
23      applications.  But if I had my staff validate
24      certain information even telephonically that I felt
25      comfortable about it or they did, then on a limited

| | | |
|---|---|---|
| 1 | | There's thousands of policies, but that's something |
| 2 | | that would have happened occasionally.  If they |
| 3 | | signed a no-loss letter, then you have sufficient |
| 4 | | information to not be responsible for a claim. |
| 5 | Q | How are you qualified to determine that a binder |
| 6 | | can be issued retroactively then?  This no-loss |
| 7 | | letter is what you use? |
| 8 | A | If I'm given the authority to bind by an insurance |
| 9 | | company and I have all the requisite parts, it |
| 10 | | doesn't matter why it's looking backwards or |
| 11 | | forwards, but you wouldn't be doing this on a |
| 12 | | regular basis.  It would be an extreme.  It would |
| 13 | | be an unusual circumstance. |
| 14 | Q | What's a producer? |
| 15 | A | A producer is a term now in the insurance world |
| 16 | | that has been fostered by the National Association |
| 17 | | of Insurance Commissioners better known as NAIC. |
| 18 | | And to attempt to bring clarity to the insurance |
| 19 | | industry, they came up with a term producer, and |
| 20 | | they define that as anyone that sells insurance. |
| 21 | | And I would argue that rather than adding clarity, |
| 22 | | it has added further confusion because these terms |
| 23 | | are thrown around rather haphazardly. |
| 24 | | There is no delineation between a |
| 25 | | producer and a broker and an agent.  And the state |

```
 1   A    I see that.
 2   Q    Okay.  So his analysis that the document on
 3        September 22nd is the binder is correct?
 4   A    Yes.
 5   Q    Okay.  Have you read Judge Goranson's decision and
 6        order?
 7   A    No.
 8   Q    So you never read it?
 9   A    No.
10   Q    Were you provided it by Attorney Vanderloop?
11   A    Not that I recall.
12   Q    Did you request it?
13   A    I don't believe I knew of it.
14   Q    Are all the opinions that you were asked to give
15        stated in your report?
16   A    Yes.
17   Q    And at this point, do you still state that all of
18        the opinions in your report are the full extent of
19        your opinions?
20   A    Yes, as of this date.
21   Q    And your testimony today is not providing any
22        additional opinions outside of what's stated in
23        your report, correct?
24   A    Correct.
25             MR. WITKOV:  Okay.  I'm done.
```